PHILIP LYNN

*v.*

THE PEOPLE OF THE STATE OF ILLINOIS.

*Opinion filed December 22, 1897.*

1. CRIMINAL LAW—*trial of police officer for murder—proof of his duties unnecessary.* On the trial of a village marshal for murder the court may refuse to admit proof of his official duties as they are defined by public law, but the jury must be properly instructed concerning them.

2. SAME—*official character of defendant is pertinent on trial for murder.* On the trial of a village marshal for murder, his official character is pertinent in determining the legal relations and duties between the defendant and the deceased, and to characterize their respective acts at the time of the killing.

3. SAME—*a village marshal may arrest without a warrant, for criminal offenses.* A village marshal is a peace officer, and may arrest a person without a warrant for a criminal offense committed in his presence, and also where a crime has been committed and he has reasonable grounds for believing that the person to be arrested is the criminal.

4. SAME—*when instruction in murder trial is erroneous and prejudicial.* An instruction in a murder trial that if the defendant went where the deceased was and provoked a difficulty, into which he voluntarily entered and in which he killed the deceased, then the act could not be justified as being in self-defense, is erroneous and prejudicial, where the defendant was a village marshal called to the scene to quell a disturbance made by the deceased.

5. SAME—*officer, when resisted, is not required to decline combat to justify slaying his assailant.* An officer whose duty it is to preserve the peace is not required to decline combat, when resisted in his duties, and to put himself out of danger, before he will be justified in slaying his assailant, as an officer so acting will be protected, though a different rule would prevail as to private individuals.

6. SAME—*whether defendant is guilty of murder or manslaughter is for the jury.* Whether a person indicted for murder is guilty of murder or manslaughter must be determined by the jury under proper instructions, and an instruction that if the jury believe certain facts they must find the defendant "guilty of murder" is erroneous.

WRIT OF ERROR to the Circuit Court of Massac county; the Hon. A. K. VICKERS, Judge, presiding.

At the November term, 1896, of the circuit court of Massac county plaintiff in error was convicted of the crime of murder and sentenced to the penitentiary for sixteen years. From this conviction he has sued out this writ of error.

It appears from the record that plaintiff in error was marshal of the village of Brooklyn, in Massac county. On the second day of May, the day the shooting took place, plaintiff in error borrowed a gun, and had been shooting unmuzzled dogs by order of the mayor. Milas Bradshaw, known among his companions as "Lightning Bug," was a negro, unmarried, but who lived with a woman called Jennie Williams. In the afternoon of said second day of May, Bradshaw and four others, colored persons, two or three being women, were engaged in playing cards in the room of one Ora Shaw, which was back of a restaurant. An alley led from the street, on the east side of the restaurant, to the rear. A saloon adjoined the restaurant on the west, and in the rear of the two buildings was a yard, in which the shooting took place. About five o'clock in the afternoon, while the plaintiff in error was in the vicinity of the saloon, a disturbance occurred between Bradshaw and his mistress, Jennie Williams, and "a woman came screaming in the alley," as Solomon Grace, one of the People's witnesses, swears, "and told him (defendant) that Lightning Bug was whipping his wife, and Lynn (defendant) went back there." This testimony is undisputed. It further appears that when the plaintiff in error reached the rear of the buildings Bradshaw and the other negroes were in the yard. Ora Shaw, another of the People's witnesses, swears: "Jennie and Bug were in a kind of a dispute, and Mr. Lynn (the marshal) walks up and demands peace; says: 'Bug, that is a good woman; you ought not to beat her in that way, and be all the time fussing and fighting and whipping her; if you don't quit I will run you in,'—says, 'If you do it any more I will run you in.'" The woman, Jennie Williams, was there. Her eyes

were blackened from a blow, but it is denied that Bradshaw did it that day. It appears that Bradshaw became angry, got up and commenced cursing the marshal, and started into the saloon, saying, as Solomon Grace swears, "No God damn white son of a bitch" could do anything with him; that he would go home and get his gun. He passed out of the front door of the saloon. In a few minutes he returned to the back yard where the marshal was and again commenced swearing at him. Grace says Bradshaw was standing in front of Ora Shaw's door, about five or six feet from the building, when he got there; that Lynn was standing in the middle of the yard, about thirty feet from Bradshaw; that he had his gun up to his shoulder and was kind of backing and going sideways, and told Bradshaw not to make a step towards him or he would kill him; that he had the gun up to his shoulder when witness first saw him, then brought it down in his hand and then raised it up again; that Lightning Bug said, "You damn white son of a bitch, you are afraid to shoot;" that Lynn then brought up the gun and shot him.

The defendant's testimony as to what occurred at this time was as follows: "The next I saw of him was when he turned the corner of the alley on me there—the alley I had gone up. I commenced backing back around this way and he come up the little walk, and against I got back as far as midway of the house he was midways too, and commenced from there coming on to me, straight towards me, and I kept backing and begging him not to come on to me,—telling him to stay off—I did not want to hurt him. He comes very slow, like he wanted to slip on me. I raised and lowered my gun three times to take aim. The last time I took aim and he got out and was standing between them beer kegs. I told him, I says, 'Bug, I don't want to kill you, but if you come any closer to me I will have to do it.' He just took his left hand and pulled his bosom open. He had on a jumper. They carry ties in them. He jerked his jumper open. He says, 'You

170—34

God damn white-livered son-of-a-bitch, I will make you do it!' and he made another step right at me and I shot him. I certainly was afraid he would hurt me. I knew if he got much closer to me he would be able to make a leap for my gun."

Defendant's brother, Boyd Lynn, testified: "I heard Phil halloo, 'Stand back; don't come on me,' and then I went out there. He was going onto Phil. Phil was back against the fence. This Jennie was grabbing at the gun and Lightning Bug was going onto him. There was about eight feet between them. I stepped past and touched Jennie on the shoulder. I says, 'Here, Jennie, stop this; get away; he will not hurt him,' and she turned around to talk to Lightning Bug. I says, 'He will not shoot him if he stays off of him.' He told her he did not want to hurt him. He says, 'If he will stay off of me I will not hurt him.' Phil stepped out to this path. The weeds were high— almost waist high. There is a path that leads across the yard. He backed into that and was making for this door, and Lightning Bug comes along this walk, walking sideways and bemeaning Phil all the time. He called him as hard names as he could. Phil was holding him off, telling him to stop; stay off of him; he did not want to hurt him. Just before the shooting Bug was walking—just keeping even with him. Phil was in this path, and says, 'Stay off and I will not shoot you.' He kept on telling him, so when he got to this door, in front of Ora Shaw's room, there was an open space there between some beer kegs in the path that led to the privy, and there is where he made at him the last time, and Phil says, 'Don't come on me,' and he throwed his bosom back that way and run his right hand back behind him and says, 'God damn white-livered son of a bitch, I will make you shoot; you have not got nerve enough to shoot,' and he made, I guess, two steps towards Phil. Then the shooting took place. Lightning Bug was considered a dangerous man."

Several witnesses were called, among them two policemen from Paducah, who testified that the deceased was a dangerous man.

Under the assignments of error plaintiff in error urges five grounds for reversal:  First, the court erred in refusing to admit proper evidence on the part of the defendant; second, in giving improper instructions on the part of the People and also in refusing proper instructions on the part of defendant; third, in overruling motion for a new trial; fourth, in rendering judgment on the verdict; fifth, the verdict was contrary to the law and the evidence.

JAMES C. COURTNEY, (BENJAMIN O. JONES, and ROBERT NUCKOLLS, of counsel,) for plaintiff in error:

The question whether the defendant is guilty of murder or manslaughter is for the jury, and they should be left free to determine that fact for themselves, and an instruction directing them to find the defendant guilty of murder is erroneous.  *Patton* v. *People*, 114 Ill. 505.

Bailiffs, constables, watchmen, etc., while in the execution of their office, are under the peculiar protection of the law,—a protection founded on wisdom and equity and in every principle of political equity, for without it the public tranquillity cannot possibly be maintained or private property secured, nor, in the ordinary course of things, will offenders of any kind be amenable to justice. 1 Russell on Crimes, 532.

In all cases, whether civil or criminal, where persons have a right to arrest and imprison, and, using the proper means for that purpose, are resisted, in so doing they may repel force with force and need not give back, and if the party making the resistance is unavoidably killed in the struggle this homicide is justifiable.   1 Russell on Crimes, 666; 1 Hale, 494.

It is the duty of all peace officers to maintain and preserve the peace, and, when acting in the exercise of their duty, to quell an affray or prevent a breach of the peace.

They are under the peculiar protection of the law, and they are never required to retreat or decline any struggle as against one openly engaged in disturbing the peace, but may stand their ground, and even attack such offenders if necessary to prevent a breach of the peace; and if such an offender is unavoidably killed by such officer in his attempt to prevent a breach of the peace, such killing is justifiable. 1 Hale, 494; 1 Hawkins, 82; 1 Foster, 321; 1 East's Pleas of the Crown, 304; *State* v. *Dierberger*, 96 Mo. 667; *Head* v. *Martin*, 85 Ky. 482; *State* v. *McNally*, 87 Mo. 644; *State* v. *Anderson*, 1 Hill, (S. C.) 327.

E. C. AKIN, Attorney General, (D. C. HAGLE, C. A. HILL, D. W. HELM, and SAWYER & EVANS, of counsel,) for the People:

To justify the taking of life in self-defense the danger must be so urgent and pressing that in order to save his own life or prevent his receiving great bodily harm the killing of the other must be absolutely or apparently necessary to the party killing. *Gainey* v. *People*, 97 Ill. 270; *Leigh* v. *People*, 113 id. 379; *Davisson* v. *People*, 90 id. 222.

To justify a defendant in killing another it is not enough that he be under reasonable apprehension of danger, but he must at the time have not only a reasonable but a well founded belief, from the surrounding circumstances, that he is actually in danger of losing his life or receiving great bodily harm. *Kinney* v. *People*, 108 Ill. 519.

While actual danger is not necessary to justify a resort to self-defense, yet circumstances must be such as to induce a reasonably well grounded belief of danger of actual loss of life or great bodily harm. *Kota* v. *People*, 136 Ill. 659.

A person, when assailed, is required to decline the combat in good faith, and use all measures that would be adopted by reasonable men to procure their safety under similar circumstances. He has no right to take the life of another unless it is actually or apparently necessary,

and the necessity, real or apparent, must be so pressing as to exclude all other reasonable means of safety before he will be justified in slaying his assailant. *Davisson* v. *People*, 90 Ill. 222; *Leigh* v. *People*, 113 id. 379.

It makes no difference what threats have been made or what the fear of danger may be, there must be some overt act by deceased before defendant can kill in self-defense. *Wilson* v. *People*, 94 Ill. 300.

When a man expects to be assaulted, his right to defend himself does not arise until he has done everything to avoid the necessity. Even if another is menacing his life, he must wait until some overt act is done and the danger becomes immediate before he is justified in killing. Moore on Crim. Law, p. 295, sec. 352; 1 East's Pleas of the Crown, 271, 272; 2 id. 272.

In a homicide, in the absence of an apparent well founded danger of great bodily harm or provocation calculated to excite irresistible passion, the law will imply malice. *Peri* v. *People*, 65 Ill. 18; *Kota* v. *People*, 136 id. 659.

Proof of character of the defendant as vicious or desperate, is, like proof of threats, admissible only when attacked, and is for the purpose of characterizing an assault made by the deceased. *Leigh* v. *People*, 131 Ill. 379.

Where a party provokes or brings on a difficulty, into which he voluntarily enters, he cannot claim self-defense. *Gainey* v. *People*, 97 Ill. 270; *Kinney* v. *People*, 108 id. 519.

Where the killing of a human being is proved, the burden of proving circumstances in mitigation is upon the accused, unless the proof on the part of the prosecution sufficiently manifested that the crime only amounts to manslaughter. *Kota* v. *People*, 136 Ill. 655.

Mr. JUSTICE CRAIG delivered the opinion of the court:

Did the court err in the instructions given on behalf of the People?—or, in other words, was the law properly presented to the jury, as applied to an officer whose duty it was to prevent breaches of the peace?

Paragraph 340 of the Criminal Code (Hurd's Stat. 1895, p. 571,) provides: "It shall be the duty of every sheriff, coroner, constable, and every marshal, policeman or other officer of any incorporated city, town or village having the power of a sheriff or constable, when any criminal offense or breach of the peace is committed or attempted in his presence, forthwith to apprehend the offender and bring him before some justice of the peace, to be dealt with according to law; to suppress all riots and unlawful assemblies, and to keep the peace, and without delay to serve and execute all warrants, writs, precepts and other process to him lawfully directed." And paragraph 342 provides: "An arrest may be made by an officer or by a private person without warrant, for a criminal offense committed or attempted in his presence, and by an officer when a criminal offense has in fact been committed and he has reasonable ground for believing that the person to be arrested has committed it."

The defendant attempted to prove his duties as marshal, but the court, on objection by the People, refused to permit it and sustained the objection. The statute expressly defines the duties of a marshal, and, being the law of the State, it was unnecessary to prove his duties. But he had the right to have the jury properly instructed on the question. Twenty-two instructions were given on the part of the People, and four are particularly objected to as erroneous and misleading. The tenth instruction is in the following language:

"And in this case, if you find, from the evidence, beyond a reasonable doubt, that the defendant went into the back yard behind the saloon of John Workman, of Brooklyn, to where the deceased was, and provoked and brought on a difficulty with the said Milas Bradshaw, in which he, the defendant, voluntarily entered, and in which he used a deadly weapon and killed the said Milas Bradshaw, then you are instructed that the defendant could not excuse said killing on the ground that it was neces-

sary for him to do said killing in order to prevent the said Milas Bradshaw from committing a great bodily injury upon him or taking his life, and you should find the defendant guilty."

The defendant was an officer whose duty it was to preserve the peace. The official character of the officer is pertinent in determining the legal relations and duties of the person killed and the person killing, with respect to each other, and thus characterizing their acts at the time of the killing. In this instruction the jury are told that if the defendant went where the deceased was and provoked and brought on a difficulty with him, into which he voluntarily entered,—regardless of the fact that he was an officer called to preserve the peace and that the difficulty was brought on by his attempt to keep the peace,—they must find defendant guilty. This instruction was erroneous and misleading in view of the testimony in the case. He did not go there voluntarily, but was called to quell a disturbance between the deceased and the woman, Jennie Williams. He was a peace officer, and under the law could arrest without warrant for a criminal offense committed in his presence, or if a criminal offense had in fact been committed and he had reasonable ground for believing that the person to be arrested had committed it. In the case of *Shanley* v. *Wells*, 71 Ill. 78, which was an action of trespass for assault and battery and false imprisonment by the defendant, a policeman of the city of Chicago, this court said (p. 82): "In *Main* v. *McCarty*, 15 Ill. 441, it was held that the power to arrest without warrant for breaches of the peace or threats to break it, exists in cases where the act was not done or threat uttered in the presence of the officer, when the charge is freshly made and the officer was required to make the arrest." See, also, *Cahill* v. *People*, 106 Ill. 621.

The fifteenth instruction given on behalf of the People is as follows:

"A person when assailed is required to decline the combat in good faith, if by so doing he could put himself out of danger, and use all means that would be adopted by reasonable men to procure their safety under similar circumstances; and he has no right to take the life of another unless it is actually or apparently necessary, and the necessity, real or apparent, must be so pressing as to exclude all other reasonable means of safety before he will be justified in slaying his assailant."

Here the jury are told that "a person when assailed is required to decline the combat in good faith, if by so doing he could put himself out of danger, and use all means" to procure his safety. Is it true that an officer whose duty it is to preserve the peace is required to decline a combat when resisted, and should put himself out of danger? Clearly not. The court should give the law as applicable to the facts in evidence in the case. An officer lawfully in the discharge of his duty would be protected where a different rule would prevail as to private individuals. In 1 Russell on Crimes (sec. 3, p. 447, Sharswood's 4th Am. ed.) the author says: "Ministers of justice, as baliffs, constables, watchmen, etc., while in the execution of their offices are under the peculiar protection of the law,—a protection founded in wisdom and equity and every principle of justice, for without it the public tranquillity can not possibly be maintained or private property secured, nor, in the ordinary course of things, will offenders be amenable to justice. For these reasons the killing of officers so employed has been deemed murder of malice prepense, as being an outrage willfully committed in defiance of the justice of the kingdom." The same author, on page 547, says: "Amongst the acts done by permission of the law, for the advancement of public justice, may be reckoned those of the officer who, in the execution of his office, either in a civil or criminal case, kills a person who assaults or resists him. The resistance will justify the officer in proceeding to the last extremity. So that, in

all cases, whether civil or criminal, where persons have a right to arrest and imprison, and, using the proper means for that purpose, are resisted, in so doing they may repel force with force and need not give back, and if the party making resistance is unavoidably killed in the struggle this homicide is justifiable." The instruction was clearly erroneous in view of all the facts in the case, and was prejudicial to the defendant.

The sixth instruction on the part of the People is as follows:

"And although the jury may believe, from the evidence, that the opprobrious epithets were used by the deceased to the defendant, yet if the jury further believe, from the evidence, that the defendant immediately revenged himself by the use of a dangerous and deadly weapon in a manner likely to cause the death of the said Milas Bradshaw, and did thereby cause his death as charged, then the defendant is guilty of murder, and the jury should so find by their verdict."

The last clause of this instruction was condemned in *Panton* v. *People*, 114 Ill. 505, where this court said (p. 509): "The last clause of the second above instruction was wrong in saying, 'and you should find him guilty of murder.' Under the indictment for murder a defendant may be found guilty of manslaughter, and the jury here should have been left free to find in that respect, without being directed by the court how they should find. The court should have said no more in such respect in the instruction than that the jury should find the defendant guilty." The direction by the court in the case at bar was erroneous for the same reason.

For error in giving the tenth, fifteenth and sixteenth instructions on the part of the People the judgment of the circuit court will be reversed and the cause remanded for another trial.

*Reversed and remanded.*