THE PEOPLE OF PUERTO RICO, Plaintiff and Appellee, *v.* LORENZO SANTANA, Defendant and Appellant.

No. 6603. Argued January 25, 1938.—Decided April 8, 1938.

*Angel M. Villamil, R. Fernández Garzot,* and *Faustino R. Aponte* for appellant. *R. A. Gómez, Prosecuting Attorney,* and *Luis Janer, Assistant Prosecuting Attorney,* for appellee.

MR. CHIEF JUSTICE DEL TORO delivered the opinion of the court.

After a verdict of voluntary manslaughter had been rendered by the jury in the criminal prosecution brought against

Lorenzo Santana for the murder of Julio Dieppa, the defendant applied for a new trial. The court denied his petition on March 10, 1937, and seven days thereafter sentenced him to three years' imprisonment in the penitentiary.

Defendant appealed from the refusal of a new trial and from the judgment. Both appeals have been prosecuted together, and the following errors, attributed to the lower court, have been assigned by the appellant in both cases, to wit: (1) in giving erroneous instructions to the jury; (2) in permitting the district attorney to take an undue advantage during the trial, thus depriving the defendant of an impartial trial; and (3) in refusing to give certain instructions requested by the defense.

The first and second errors can be considered and decided jointly.

As we have already said, the information charged the defendant with the crime of murder, that is, the unlawful and wilful killing of a human being with malice aforethought and the definite intention to kill.

The evidence is not conflicting as to the fact that Santana fired his weapon against Dieppa. It is conflicting as to how and why the shot was fired.

According to the testimony of Dr. R. Mejías Ruiz who performed the autopsy of the deceased, Dieppa had a bullet wound in the breast, another in the back, both being serious, and another slight wound in the front part of his wrist. The bullet causing the first wound left the body through the cubital region, and the one causing the second remained lodged in the right lung. Death resulted from internal hemorrhage and traumatic shock caused by the serious wounds.

The witness Marcos A. Pagán, a policeman who was having lunch at Dieppa's home on December 11, 1934, described the incident as follows:

"We were just finishing our lunch when there was a knock at the door . . . the fellow from the gas station went to the door and they told him 'we don't want you, we want Julio' . . . then Julio

Dieppa got up and went to the door, but they were already coming in . . . Mr. Amy (Collector of Internal Revenue), Mr. Bermúdez (Insular Policeman) and Santana (Insular Policeman), the three of them . . . they handed a sheet of paper to Dieppa and Dieppa answered 'this is not for me' . . . and threw it away . . . and then he began to run towards the place where I was and got in behind and then the shot was fired . . . the first shot I warded off with my arm, it was fired by Bermúdez, but it did not wound him . . . then it was that Santana fired and hit Julio who fell to the floor. . . I went outside and Santana began to search the house.''

The witness Mercedes Muñoz, widow of Dieppa, related the occurrence, thus:

''. . . we had barely finished our lunch when they came in . . . that man there (pointing to the defendant), policeman Bermúdez and another short man, whom I do not remember, all of them revolver in hand. At this moment, my husband got up from the table, surprised, and said 'What is this?' and then and there. . . Policeman Bermúdez fired at him . . . then Policeman Santana fired at my husband. Immediately thereafter he was stretched out on the floor, and then he fired at him again . . . I began to yell . . . he pushed me against the wall and said to me 'There he is, take him away if you wish.' ''

There is other evidence for the prosecution to the same effect. From that of the defense we shall take the essential parts of the testimony of Bermúdez and Santana. Both were accused but Santana requested that he be separately tried, and what we have before us concerns his trial.

Bermúdez testified as follows:

''. . . On December 11, 1934, we left the police station towards the house of the Municipal Judge of Humacao to get a search warrant signed . . . he signed it and then the internal revenue agents came for us with Policeman Santana . . . and we left for the house of Dieppa . . . when we arrived . . . Santana knocked . . . Pagán, a policeman who was at Dieppa's house, answered asking whether we were looking for him . . . and Santana said 'no, we are looking for Dieppa', and then the latter came towards us . . . I said to him 'Mr. Dieppa, I have here a search warrant to search your house'—the search warrant is presented and admitted in evidence

—he took it . . . read it and threw it away and said to us 'go away now and come back later' . . . and I said to him 'Mr. Dieppa, this is not a matter to be postponed, this is something to be done now'. . . . I picked up the search warrant, stepped towards him and he pushed me so that I stumbled backwards . . . he pulled out a revolver from his back pocket, fired twice . . . the bullet in the revolver stuck and he threw it away . . . retreated to a cabinet, rapidly, and grabbed another revolver, and when he pointed it at me Policeman Santana fired at him . . . when Santana fired I heard other shots but I do not know who fired them. . . I saw Dieppa when he was on the floor and when Santana and Morales picked him up and took him away . . . we—the internal revenue agents, myself and Policeman Ferrer and the policeman who is now in the United States—went in and found twelve alcohol tins in some of the rooms . . .''

Santana, in short, stated:

''On the day in question I was at my house in Pasto Viejo. Chief Castillo called me and requested that I go immediately to town. When I arrived at the Police Station of Humacao the Chief said to me: 'You are to leave immediately with Policeman Bermúdez and Policeman Fernández to serve a search warrant at the home of Mr. Dieppa' . . . we arrived at the porch of the house, I knocked. . . Policeman Pagán who was in the house saw me and said 'do you want me, Santana?' . . . and I said to him 'not you, Mr. Dieppa' . . . the latter got up from the table and came over. . . Policeman Bermúdez, who had the search warrant, said to him 'here is this search warrant for you, Mr. Dieppa. We have come to search the house.' . . . He took it, read it, and threw it away and said 'go away, I have no time to see you now.' Then Bermúdez picked up the warrant, advanced towards the parlor. . . Dieppa pushed him and at the same time pulled out a revolver which he had in his back pocket and fired, and when he fired the shot, I, who was at the other corner, tried to grapple with Mr. Dieppa. Then it was that he fired a second shot and I was wounded in the finger . . . . then the revolver stuck . . . he threw it on the floor . . . ran to a cabinet . . . and grabbed another revolver . . . when I saw that he intended to get another revolver I tried to hold him, . . . but then Policeman Pagán, who has testified at this trial, grabbed me in such a manner that I was unable to struggle with Mr. Dieppa. Then it was that he advanced towards Policeman Bermúdez with the other revolver and I was able to release myself from Policeman Pagán and

threw myself to the floor, pulled out my revolver, and fired at the same time. Then one or two more shots were fired, and Mr. Dieppa fell.''

The evidence is more extensive, but what we have extracted from it is sufficient to enable us to decide the assignments of error under consideration. In his instructions the trial judge correctly summed up the evidence; then he defined the crime charged against the defendant—murder—and that of manslaughter, and said:

''As the gentlemen of the jury have been able to observe, the defendant has invoked self-defense in this case. He admits that he fired at Dieppa, although it is true that he alleges that he only fired one shot at him, and from the evidence for the prosecution it appears that Dieppa received three wounds. The defendant maintains that if he killed Dieppa it was in self-defense.

''Self-defense constitutes the right which every porson has to use the necessary force to prevent the loss of his own life or to avoid serious bodily injury, when his life is in immediate and imminent danger. . .''

The judge went on to state fully the law with regard to self-defense, including in his definition the defense of another person, as follows:

''Self-defense is not necessarily limited to the defense of the life of the defendant, but may also be invoked when one kills in defense of another person whose life the deceased is trying to take or who is in danger of serious bodily injury. Therefore, the fact that the assault was not directed against Santana, but against Bermúdez, by itself, does not deprive the defendant of the right of self-defense, because if the life of his fellow officer, Bermúdez, was to be taken, the defendant had a right to defend it as much as if it was his own life.''

He then referred to the presumption of innocence, to reasonable doubt, to the burden of proof, all in accordance with the law, and he concluded by suggesting to the jury the verdicts which they might render, to wit: guilty of murder in the second degree, if they believed the evidence for the prosecution; guilty of manslaughter, if they believed ''that

when Santana received the wound which he claims to have received on his finger, he became aroused and in a moment of anger made use of his revolver and took the life of Dieppa, . . . . without it being a case of self-defense''; not guilty, for the reason that he acted in lawful defense of his fellow officer Bermúdez, if they believed the testimony of the latter and defendant's own testimony; and likewise not guilty, if they had a reasonable doubt as to his guilt or as to whether or not he acted in self-defense.

As we know, the errors under consideration are said to have been committed by the court in giving its instructions to the jury and in refusing to give those requested by the defense. We have just referred to the former. The latter appear in writing. The first, second, third, and fourth instructions refer to self-defense. It is enough to say with regard to them that, inasmuch as the court had already instructed the jury correctly on the point, there was no error. The fifth, sixth, seventh, and eighth requests refer to justifiable homicide committed by public officers. We shall transcribe the sixth and seventh instructions which we consider sufficient to examine the question raised. They read as follows:

"*Sixth Instruction.*—The court instructs the jury that a homicide is justifiable when committed by public officers in the following cases:

"(1) In the execution of a judgment of a competent court.

"(2) When it be necessary to commit it in order to overcome any resistance offered against the execution of a judicial order or against the discharge of any legitimate function of the officer.

"In this regard the court instructs you that a search warrant is one of the judicial orders to which reference is made in the legal provision which I have just stated.

"*Seventh Instruction.*—The court instructs you that a peace officer who is resisted in the execution of a judicial order is not bound to decline a struggle but may insist in exercising whatever force is reasonably necessary and is justified in killing his adversary under circumstances which would not entitle a private person to do so.''

The same question which is now under our consideration was raised before the trial court in the motion for a new trial, and in deciding it against the defendant that court, citing from May—Criminal Law, 3rd ed., 211—and the cases of *People* v. *Adams*, 24 P. 629, 631 and *Stephens* v. *Commonwealth*, 47 S. W. 229, 230, and transcribing its instructions as to self-defense, said:

"These instructions fully cover the law applicable to this case and whether we call it excusable or justifiable homicide, the result is the same and the verdict would have been that rendered by the jury and no other. Therefore, no prejudice was caused to the defendant in refusing to give the instruction requested, which undoubtedly would have brought confusion to the minds of the jury, inasmuch as only a mere misdemeanor was involved and, under such circumstances, the defendant was not justified in killing Dieppa simply to execute a search warrant unless his life were at stake.

 *   *   *   *   *   *   *

"Nowhere in the instructions of the court was it insinuated nor could the jury arrive therefrom at the conclusion that Santana and his companions were under a duty to retreat or to avoid the conflict offered according to them by the deceased Dieppa. On the contrary, in the instructions delivered to the jury it was assumed that those persons were there in the discharge of a legal duty, and in harmony with this premise the jury was instructed in the manner already mentioned.

"We maintain that the instructions given to the jury are correct, and even if they should have some formal or merely technical defect, no prejudice was thereby caused to the defendant, and if no prejudice was caused, the new trial can not be granted for the first and second grounds already stated."

In our opinion, just as the trial judge summed up the evidence without the omission of any important detail, from which summary, everything with regard to the search warrant and the events which accompanied its execution could be gathered, he should likewise have stated the principles of law involved to their full extent, and he failed do so in spite of the request to that effect made by the defendant through his attorney.

18

The sixth instruction which was refused is correct. It is based on the law itself, section 208 of the Penal Code. The seventh is suggested by one which is set forth in volume 2, page 628, paragraph 1523 of Blashfield on Instructions to the Jury, allegedly based on the case of *Lynn* v. *State*, 170 Ill. 527, and also seems correct.

The court should have transmitted and duly supplemented them, or it should have covered the whole ground by means of it own instructions on the subject. It did neither of these things.

It is true that in the case from California which the court cited, it was said:

"There was no error in the instructions of the court laying down the law of self-defense. The whole theory of the defense was that the killing was necessary, not for the purpose of making the arrest, but to prevent Collins from killing the defendant. The defendant himself confines his justification to that ground. And, even if he had also made a serious claim that the killing was necessary in order to effect the arrest, it would have been proper and necessary to give the law of self-defense complete, and in doing so to use the expression complained of, viz., that the defendant 'must have acted under the influence of such fears alone,' confining its application, of course, to this ground of defense."

But it was immediately added:

"*And we think the colocation of the instructions in this case was such,* especially in view of the defendant's testimony, *that the jury could not have failed to apply the expression complained of exclusively to the plea of self-defense. It is true the court refused to give one instruction asked by defendant, to the effect that a homicide is justifiable when necessarily committed in a lawful attempt to arrest a person who has committed a felony, and this might have prejudiced the defendant but for the fact that another instruction, also drawn by his counsel, in slightly different terms, but in substance the same, had already been given.* The instruction so given was in the following terms, and we think covers the whole ground: 'The court charges the jury that an officer in making an arrest has the right to use all the force which from the surrounding circumstances

seems to him, as a reasonable man, necessary; that he has a right to arm himself and to go armed, and, where the offense charged is a felony, he has a right, if apparently necessary to a reasonable man, to kill the person whom he is seeking to arrest; and he has a right, and it is his duty, to arrest a man who has committed a felony, with or without a warrant.' '' (Italics ours.)

In said case, the trial court itself covered the field which the defense wanted to cover and it was for this reason that the appellate court was able to support its ruling; but in the case at bar, as we have said, not only did the lower court fail to transmit instructions requested by the defense but it also failed absolutely to give its own instructions on the same subject, and the law in force with regard to justifiable homicide was not fully made known to the jury.

Perhaps, as it occasionally happens, we may be obliged herein to reverse a judgment which is substantially sound, but we have no other alternative. It was the duty of the lower court to instruct the jury with regard to all the law involved, and the jury was not instructed as to an essential part of that law.

Therefore, the reversal of the judgment and the granting of a new trial are imperative, which makes it unnecessary for us to decide the other assignment of error. However, it seems proper and advisable to say with regard to the same, that some of the statements made by the district attorney during the course of the trial which the defense maintains deprived the defendant of his right to an impartial trial, although they really may not have produced that effect, constitute improper deviations from the conduct which the district attorney should follow in the courts of justice when he appears on behalf of the People to prove and uphold his accusation.

For the reasons stated the judgment and order appealed from must be reversed and a new trial granted.