El Pueblo de Puerto Rico, demandante y apelado, *v.* Lorenzo Santana, acusado y apelante.

Núm. 6603.—*Sometido:* Enero 25, 1938. *Resuelto:* Abril 8, 1938.

*Angel M. Villamil, R. Fernández Garzot* y *Faustino R. Aponte,* abogados del apelante; *R. A. Gómez, Fiscal,* y *Luis Janer, Fiscal Auxiliar,* abogados de El Pueblo, apelado.

EL JUEZ PRESIDENTE SEÑOR DEL TORO emitió la opinión del tribunal.

Rendido veredicto por el jurado que intervino en la causa criminal seguida contra Lorenzo Santana por asesinato de Julio Dieppa, declarando culpable de homicidio voluntario al acusado, éste solicitó un nuevo juicio. La corte negó su petición en 10 de marzo de 1937 y dictó sentencia siete días después condenándolo a tres años de presidio.

El acusado apeló de la negativa del nuevo juicio y de la sentencia. Ambos recursos se han tramitado conjuntamente, señalándose como errores comunes a los dos los cometidos por la corte a juicio del apelante 1, al transmitir instrucciones erróneas al jurado; 2, al permitir al fiscal que tomara ventajas indebidas durante la celebración del juicio, privando al acusado de un juicio imparcial, y 3, al negarse a transmitir ciertas instrucciones solicitadas por la defensa.

Los señalamientos primero y segundo pueden estudiarse y resolverse a la vez.

Como ya indicamos, la acusación imputó al acusado un delito de asesinato, esto es, la muerte ilegal y voluntaria de un ser humano, con malicia premeditada y propósito firme de producirla.

La evidencia de una y otra parte no es contradictoria en cuanto al hecho de haber disparado Santana su arma de fuego contra Dieppa. Lo es en cuanto a cómo y por qué se realizó el disparo.

Según declaración del doctor R. Mejías Ruiz que practicó la autopsia de su cadáver, Dieppa tenía una herida de bala

en el frente del pecho, otra en la espalda, ambas graves, y otra leve en el lado anterior de la muñeca. La bala de la primera herida salió por la región cubital, la de la segunda quedó dentro del pulmón derecho. La muerte sobrevino por hemorragia interna y *shock* traumático causados por las heridas graves.

El testigo Marcos A. Pagán, policía insular que se encontraba almorzando en casa de Dieppa el once de diciembre de 1934, describe el suceso como sigue:

"Terminando el almuerzo tocaron a la puerta . . . se levantó el del garage de gasolina y le dijeron 'no es a usted, es a Julio' . . . entonces Julio Dieppa se levantó y fué a la puerta, pero ya ellos entraron . . . el Sr. Amy (Colector de Rentas), el Sr. Bermúdez (Policía Insular) y Santana (Policía Insular), los tres . . . le entregaron un pliego a Dieppa y Dieppa contestó 'esto no es para mí' . . . y lo tiró . . . y salió corriendo a la parte donde yo estaba y se metió detrás y ahí vino el disparo . . . el primer disparo lo evité yo con el brazo, lo hizo Bermúdez, pero no lo hirió . . . entonces fué que Santana tiró y cogió a Julio (quien) cayó al suelo . . . yo salí para afuera y (Santana) empezó a buscar la casa."

Y la testigo Mercedes Muñoz Viuda de Dieppa lo narra así:

". . . no bien habíamos terminado el almuerzo cuando entraron . . . ese señor que está ahí (señalando al acusado), el policía Bermúdez y otro señor bajito, que no recuerdo, con revólver en la mano todos. Ahí mi esposo se levantó de la mesa sorprendido y dijo '¿Qué es esto?' y ahí mismo . . . el policía Bermúdez le disparó . . . entonces el policía Santana le disparó a mi esposo. Ahí mismo queda él tendido en el suelo y ahí vuelve y le disparó otra vez . . . yo empecé a gritar . . . y él me violentó contra el medio punto y me dijo 'Ahí lo tiene, recójalo si quiere.' "

Otra prueba de cargo existe en el mismo sentido. De la de descargo extractaremos lo esencial de las declaraciones de Bermúdez y Santana. Ambos fueron acusados pero Santana pidió ser juzgado separadamente y lo que está ante nosotros es su juicio.

Dijo Bermúdez:

"... El 11 de diciembre de 1934 salimos del cuartel con dirección a la casa del Juez Municipal de Humacao para firmar una orden de allanamiento . . . nos la firmó y llegaron los agentes de rentas internas acompañados del guardia Santana a buscarnos . . . y salimos con rumbo a la casa de Dieppa . . . al llegar . . . tocó el guardia Santana . . . contestó Pagán, un policía que estaba en la casa de Dieppa, si era a él . . . y Santana dice 'no, al señor Dieppa', y entonces vino . . . y yo le dije 'Señor Dieppa, aquí traigo una orden de allanamiento para registrar su casa'—se introduce y se admite la orden en evidencia—la cogió . . . la leyó y la tiró y nos dice 'váyanse y vengan después' . . . y yo le dije 'Señor Dieppa, esto no es asunto de volver después, éste es asunto de ahora' . . . recogí la orden . . . di un paso para alante y él me dió un empujón y yo me fuí para atrás . . . sacó un revólver del bolsillo de atrás . . . hizo dos disparos . . . el revólver le amarró fuego y lo tiró . . . se cejó para atrás y se fué a un chinero, rápido, y cogió otro revólver, y cuando me apuntó, el guardia Santana le hizo un disparo . . . al Santana disparar oí otras detonaciones más, pero no se quién las hizo . . . vi a Dieppa cuando estaba en el suelo que lo recogió Santana y Morales y se lo llevaron . . . nosotros—los agentes de rentas internas, yo, el guardia Ferrer y el guardia que está en los Estados Unidos—fuimos y encontramos en unas habitaciones doce latas de alcohol . . ."

Y Santana se expresó en resumen como sigue:

"En el día de que se trata estaba en mi casa de Pasto Viejo, me llamó el Jefe Castillo para que fuera inmediatamente al pueblo. Cuando llegué al cuartel de Humacao el Jefe me dijo: 'Va a salir inmediatamente con el policía Bermúdez y el policía Fernández a cumplimentar una orden de allanamiento para casa del Sr. Dieppa' . . . llegamos hasta el balcón de la casa . . . toqué . . . el policía Pagán que se encontraba allí me vió y me dice '¿Santana, a mí? . . . y yo le digo 'a usted no, al señor Dieppa.' . . . Éste se levantó de la mesa y vino . . . el policía Bermúdez, que llevaba la orden, le dijo 'aquí tiene usted, señor Dieppa, este allanamiento. Venimos a registrar la casa.' . . . Él la cogió, la leyó . . . y se la tiró . . . y dijo 'váyanse, ahora no tengo tiempo de atenderlos.' Entonces Bermúdez recogió la orden . . . avanzó hacia la sala . . . Dieppa le dió un empujón . . . con la misma echó para atrás y jaló el revólver que tenía en el bolsillo de atrás e hizo un disparo, y cuando él hizo ese disparo, yo que estoy en la otra esquina, quise agarrarme con

el Sr. Dieppa. Ahí hizo un segundo disparo y fué cuando me hirió . . . en el dedo . . . entonces el revólver le falla . . . lo tiró al suelo . . . corre para el chinero . . . y empuña otro revólver . . Cuando le vi la intención de querer coger otro revólver, con él quise agarrarme, . . . pero ahí voló el policía Pagán, que declaró aquí, y me agarró a mí en tal forma que yo no pude enredarme con el señor Dieppa. Ahí fué cuando él vino para encima del policía Bermúdez con el otro revólver y yo me le tiro contra el suelo al policía Pagán, halo por mi revólver y le hago un disparo en ese momento. Entonces salieron uno o dos disparos más y ahí cae el señor Dieppa.''

La prueba es más amplia pero lo extractado de ella es suficiente para resolver los señalamientos de error que estudiamos. En sus instrucciones el juez sentenciador resumió correctamente la evidencia, definió seguidamente el delito imputado al acusado—asesinato—y el de homicidio, y dijo:

''Como han podido apreciar los caballeros del jurado, el acusado ha invocado la defensa propia en este caso. Él admite que disparó contra Dieppa, si bien es verdad que alega que sólo hizo un disparo contra éste, y de la prueba de cargo aparece que Dieppa recibió tres heridas. El acusado alega que de haber sido él el causante de la muerte de Dieppa, lo hizo en defensa propia.

''La defensa propia consiste en el derecho que tiene toda persona de usar la necesaria fuerza para evitar la pérdida de su vida o recibir grave daño corporal, cuando su vida se halla en inminente e inmediato peligro. . . .''

Continúa el juez y en forma completa expone la ley relativa a la legítima defensa, comprendiendo en ella el caso de la defensa de otra persona, como sigue:

''La defensa propia no necesariamente está limitada a defender la vida del acusado, sino que puede invocarse también cuando se mata en defensa de otra persona a quien el interfecto quiere privar de la vida o inferirle grave daño corporal. De modo que el hecho de que el ataque, aunque no fuera directamente contra Santana, sino contra Bermúdez, esa circunstancia, por sí sola, no priva al acusado del derecho a la defensa propia, porque si en efecto se iba a quitar la vida a su compañero Bermúdez, el acusado tenía derecho de defenderla, como si se tratara de su propia vida.''

Se refiere entonces a la presunción de inocencia, a la duda razonable, al peso de la prueba, todo de acuerdo con la ley, y termina sugiriendo al jurado los veredictos que puede rendir, a saber: culpable de asesinato en segundo grado, si cree la prueba de cargo; culpable de homicidio, si cree "que al recibir Santana la herida que alega recibió en un dedo de la mano, montó en cólera y en un momento de ira hizo uso de su revólver y privó de la vida a su semejante Dieppa, . . . . sin ser un caso de defensa propia;" no culpable por haber actuado en legítima defensa de su compañero Bermúdez, si cree la declaración de éste y su propio testimonio; y no culpable también si tiene duda razonable de su culpabilidad o de si actuó o no en legítima defensa.

Los errores que estudiamos, como sabemos, se imputan a la corte como cometidos por ella al transmitir sus instrucciones al jurado y al negarse a transmitirle las que le pidiera la defensa. Acabamos de referirnos a las primeras. Las últimas constan por escrito. La primera, la segunda, la tercera y la cuarta se refieren a la defensa propia. Bastará decir en cuanto a ellas que habiendo la corte instruído al jurado debidamente sobre el punto, no hay error. La quinta, la sexta, la séptima y la octava se refieren a los homicidios justificables cometidos por funcionarios públicos. Transcribiremos la sexta y la séptima que estimamos suficientes para examinar la cuestión suscitada. Dicen:

"Sexta Instrucción.—La corte instruye al jurado que el homicidio es justificable cuando fuere cometido por funcionarios públicos, en los siguientes casos:

"(1) En cumplimiento de una sentencia de tribunal competente.

"(2) Cuando hubiere necesidad de cometerlo para vencer cualquiera resistencia que se opusiere a la ejecución de una orden judicial o en cumplimiento de cualquiera de sus demás funciones legítimas.

"A este respecto la corte os instruye que una orden de allanamiento de morada es una de las órdenes judiciales a que hace referencia el precepto legal que acabo de exponer.

"Séptima instrucción.—La corte os instruye que un oficial de la paz a quien se le opone resistencia al cumplimentar una orden judicial no está obligado a declinar un combate, sino que puede insistir en ejercer cualquiera fuerza que sea razonablemente necesaria, y está justificado en matar a su antagonista bajo circunstancias en que una persona particular no podría hacerlo."

La misma cuestión que ahora se somete a nuestra consideración y resolución fué levantada ante la propia corte sentenciadora en la moción de nuevo juicio y al decidirla en contra del acusado, la corte, citando al tratadista May—Criminal Law, 3rd. ed. 211—y los casos de *People* v. *Adams,* 24 P. 629, 631 y *Stephens* v. *Commonwealth,* 47 S. W. 229, 230, y transcribiendo sus instrucciones sobre legítima defensa, dijo:

"Estas instrucciones abarcan perfectamente la ley aplicable al caso, y llámese homicidio excusable o justificable, el resultado es el mismo y el veredicto hubiera sido el que trajo el jurado y no otro. De manera pues, que ningún perjuicio se causó al acusado al denegar la instrucción solicitada, la cual indudablemente hubiese llevado confusión a la mente del jurado, ya que se trataba de un mero *misdemeanor,* y en tales condiciones el acusado no estaba justificado en matar a Dieppa simplemente para ejecutar la orden de allanamiento a menos que su vida estuviese en peligro.

"                .        .        .        .        .        .        .        .        .

"En ninguna parte de las instrucciones de la Corte se insinúa ni por ellas puede llegar el jurado a la conclusión de que Santana y sus compañeros estaban en la obligación de retroceder o de evitar el combate propuesto según ellos por el interfecto Dieppa. Por el contrario, en las instrucciones que recibió el jurado, se asume que ellos estaban allí en el cumplimiento de un mandato de la ley y en armonía con esta premisa se instruyó al jurado en la forma antedicha.

"Sostenemos que las instrucciones transmitidas al jurado son correctas y que en el caso de adolecer de algún defecto de forma o meramente técnico, ningún perjuicio se causó con ello al acusado y si ningún perjuicio se le causó, no procede la concesión de un nuevo juicio por los fundamentos 1 y 2 antes expuestos."

A nuestro juicio el juez sentenciador lo mismo que extractó la prueba sin omitir detalle importante alguno, surgiendo de

su extracto todo lo relativo a la orden de allanamiento y a lo ocurrido al tratar de cumplimentarla, lo mismo, repetimos, debió exponer los principios de ley envueltos en toda su amplitud y no lo hizo no obstante haber pedido el acusado por medio de su abogado que lo hiciera.

La instrucción sexta no transmitida es correcta. Se basa en la propia ley, artículo 208 del Código Penal. La séptima se inspira en una que aparece en el tomo 2, pág. 628, apartado 1523 de la obra de Blashfield sobre Instrucciones al Jurado, como basada en el caso de *Lynn* v. *State*, 170 Ill. 527, y también parece correcta.

La corte debió transmitirlas complementándolas debidamente o cubrir el campo con instrucciones suyas por entero sobre la materia. Y no hizo ni una ni otra cosa.

En el caso de California que la corte invoca, es cierto que se dijo:

"La Corte no cometió error en sus instrucciones al exponer la ley sobre defensa propia. Toda la teoría de la defensa fué que la muerte del interfecto fué necesaria no con el fin de efectuar el arresto, sino para impedir que Collins matara al acusado. El mismo acusado limita su justificación a ese motivo. Y, aún si hubiera insistido seriamente en que la muerte del interfecto era necesaria para efectuar el arresto, habría sido propio y necesario exponer la ley sobre la defensa propia en su totalidad, y, al así hacerlo, usar la expresión de que se queja el apelante, o sea que el acusado "debió haber actuado bajo la influencia de tales temores solamente,' limitando su aplicación, desde luego, a esta defensa."

Pero seguidamente se agregó:

"*Y creemos que el orden seguido al dar las instrucciones en este caso fué tal*, especialmente en vista del testimonio del acusado, *que el jurado nunca pudo dejar de aplicar la expresión objetada exclusivamente a la alegación de defensa propia. Es cierto que la corte se negó a transmitir una instrucción solicitada por el acusado, al efecto de que el homicidio es justificable cuando se comete necesariamente al intentar por medios legítimos la prisión de algún reo de delito grave, y esto quizá pudo perjudicar al acusado, a no ser por el hecho de que otra instrucción, redactada también por su abogado,*

*en términos ligeramente distintos, pero substancialmente igual, ya había sido dada.* La instrucción así transmitida estaba concebida en los siguientes términos, y a nuestro juicio cubre toda la cuestión: 'La corte instruye al jurado que un funcionario al efectuar un arresto tiene derecho a usar toda la fuerza que, a juzgar por las circunstancias que le rodean, como hombre razonable, sea necesaria; que tiene derecho a estar armado y que cuando el delito imputado es grave tiene igualmente derecho, de ser aparentemente necesario a un hombre razonable, a dar muerte a la persona que trata de arrestar; y que tiene derecho además a, y es su deber, arrestar a una persona que ha cometido un delito grave, con o sin mandamiento de arresto.' '' (Itálicas nuestras.)

La corte sentenciadora cubrió, pues, por sí misma el campo que quiso cubrir la defensa y a ello se debió que la corte de apelación pudiera sostenerla; pero aquí como hemos dicho no sólo la corte sentenciadora dejó de transmitir las instrucciones que la defensa solicitara, si que omitió en absoluto darlas por sí misma, y la ley en vigor sobre homicidio justificable no le fué dada a conocer por completo al jurado.

Quizá como en algunas ocasiones sucede, nos veremos obligados a revocar una sentencia justa substancialmente, pero no podemos hacer otra cosa. Era la obligación de la corte instruir al jurado sobre toda la ley envuelta, y sobre una parte esencial de esa ley el jurado no fué instruído.

La revocación de la sentencia y la concesión de un nuevo juicio se imponen por tal motivo sin que exista en su consecuencia necesidad de resolver el otro señalamiento de error. Sin embargo, parece oportuno y conveniente decir en cuanto al mismo que algunas de las manifestaciones que hizo el fiscal durante el curso de la vista que se sostienen por la defensa privaron al acusado de su derecho a un juicio imparcial, si bien tal vez no monten a tanto, es lo cierto que constituyen desviaciones impropias de la actitud que debe asumir el ministerio público en los tribunales de justicia cuando ante ellos comparece en representación del Pueblo para probar y sostener sus acusaciones.

*Por virtud de todo lo expuesto debe declararse con lugar el recurso y en su consecuencia revocarse la sentencia y la resolución apeladas, concediéndose la celebración de un nuevo juicio.*